# Syllabus

Chief Justice:
Robert P. Young, Jr.

Justices:
Stephen J. Markman
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein
Joan L. Larsen

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Corbin R. Davis

BANK OF AMERICA, NA v FIRST AMERICAN TITLE INSURANCE CO

Docket No. 149599. Argued October 15, 2015 (Calendar No. 7). Decided April 13, 2016.

Bank of America brought an action in the Oakland Circuit Court against First American Title Insurance Company, Westminster Abstract Company, and others, alleging breach of contract and negligent misrepresentation in connection with mortgages that plaintiff had partially financed on four properties whose value had been fraudulently inflated and whose purchasers were straw buyers who had been paid for their participation. Shortly after closing, all four borrowers defaulted. Plaintiff foreclosed by advertisement and subsequently bought all four properties at sheriff sales. Two of the purchases were by full credit bids, which are bids in the full amount of the unpaid principal and interest plus foreclosure costs. Plaintiff then sold the properties to bona fide purchasers at what it asserted was a loss of approximately $7 million. After discovering the underlying fraud in the four loans during the foreclosure proceedings, plaintiff sued, among others, First American, which had issued closing protection letters that promised to reimburse plaintiff for actual losses incurred in connection with the closings if the losses arose from fraud or dishonesty, and Westminster, alleging that it had violated the terms of the closing instructions. The other defendants either defaulted or were dismissed. The court, Denise Langford Morris, J., granted the remaining defendants' motion for summary disposition of plaintiff's breach of contract claims under MCR 2.116(C)(10) after plaintiff voluntarily dismissed its negligent misrepresentation claim. On appeal, the Court of Appeals, MARKEY and RIORDAN, JJ. (MURPHY, C.J., concurring in part and dissenting in part), affirmed with respect to Westminster and reversed in part with respect to First American in an unpublished opinion per curiam issued March 27, 2014 (Docket No. 307756). The Court of Appeals held that plaintiff's claim against First American relating to the properties on which it had made full credit bids was barred by *New Freedom Mtg Corp v Globe Mtg Corp*, 281 Mich App 63 (2008), which held that when a mortgagee takes title to property pursuant to a full credit bid, the mortgage debt is satisfied and the mortgage is extinguished, precluding the mortgagee from later claiming that the property was worth less than the bid. With respect to First American's liability on the other two closings, the Court of Appeals concluded that the trial court properly granted summary disposition to First American and Westminster because plaintiff had failed to produce evidence that created a question of fact regarding whether Westminster knew of or participated in the underlying fraud in those closings. Finally, the Court of Appeals concluded that plaintiff had not established a link between Westminster's alleged violations of the closing instructions and the claimed damages and, even if a link had been established, there were no damages because of

plaintiff's full credit bid at the foreclosure sale. The Supreme Court granted plaintiff's application for leave to appeal. 497 Mich 896 (2014).

In a unanimous opinion by Justice VIVIANO, the Supreme Court *held*:

The Court of Appeals erred by concluding that plaintiff's full credit bids barred its contract claims against the nonborrower third-party defendants. To the extent that *New Freedom* held that the full credit bid rule barred contract claims brought by a mortgagee against nonborrower third parties, it was overruled. Further, the closing instructions agreed to by plaintiff and Westminster constituted a contract upon which a breach of contract claim could be brought. Finally, the lower courts erred by relying on *New Freedom* to interpret the credit protection letters given that the terms of the letters in *New Freedom* differed materially from the ones at issue.

1. The Court of Appeals erred by holding that the full credit bid rule barred plaintiff's claims against Westminster and First American. The Court of Appeals relied on *New Freedom*, which held that when a mortgagee makes a full credit bid that results in the acquisition of the property, the mortgagee is precluded from later claiming that the property is actually worth less than the bid for purposes of collecting its debt. Although the full credit bid rule was not a creature of statute, it bore a relationship to the foreclosure by advertisement and anti-deficiency statutes, which were designed to govern the relationship between, and establish the rights and liabilities of, the mortgagee and mortgagor, not nonborrower third parties. There was no apparent justification for extending the protections of the full credit bid rule to alter the contractual rights and liabilities between a mortgagee and nonborrower third parties. Accordingly, the full credit bid rule did not bar contract claims by a mortgagee against nonborrower third parties, and *New Freedom* was overruled to the extent that it conflicted with this decision.

2. The closing instructions agreed to by plaintiff and Westminster constituted contracts upon which a breach of contract action could lie. The closing instructions required Westminster to contact plaintiff immediately if it could not comply with the instructions and specified that Westminster, as the closing agent, was financially liable for any loss resulting from its failure to follow the instructions. Any alterations or amendments to the instructions had to be in writing and faxed with a confirmation receipt, and any changes approved by plaintiff had to be initialed by all signatories. In addition, plaintiff had to approve the HUD-1 settlement statement before closing. A valid contract requires (1) parties competent to contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation. The parties did not dispute that they were competent to contract or that loan closings were a proper subject matter for a contract. Westminster received a fee in exchange for handling the closings, thus satisfying the consideration requirement. There was also mutuality of agreement and mutuality of obligation. Plaintiff submitted the closing instructions to Westminster, and Westminster agreed to the closing instructions by performing the closings for plaintiff. Further, Westminster acknowledged that it understood its obligations under the closing instructions and agreed to perform those obligations. As a result, the closing instructions satisfied all of the elements of a valid contract.

3. The Court of Appeals erred to the extent it concluded that the contracts between plaintiff and Westminster were modified by the closing protection letters between plaintiff and First American because Westminster was not a party to the closing protection letters and plaintiff and Westminster did not mutually agree to modify the obligations under the closing instructions. Although parties to a contract are at liberty to modify or waive the rights and duties established by a contract by mutual agreement, a party cannot unilaterally alter an existing bilateral agreement. Nothing in the contract purported to limit or modify Westminster's duties as the closing agent. Instead, the contract merely provided the limitations on First American's agreement to indemnify plaintiff for any errors arising from the closing on behalf of the closing agent, which was Westminster. The Court of Appeals' analysis of this issue was vacated and the case was remanded to the trial court for it to reconsider, under the parameters set forth in this opinion, whether summary disposition under MCR 2.116(C)(10) was appropriate as to plaintiff's claim for breach of contract against Westminster.

4. The trial court and the Court of Appeals majority erred by imposing additional requirements on plaintiff that were not found in the plain language of the parties' closing protection letters. A closing protection letter (CPL) is a contract between the title company and the lender whereby the title company agrees to indemnify the lender for any losses caused by the failure of the title agent to follow the lender's closing instructions. Under the CPLs in the instant case, First American agreed to reimburse plaintiff for actual losses plaintiff incurred in connection with the specified closings when conducted by an agent authorized to issue title insurance for the company when the loss arose out of fraud or dishonesty of the issuing agent handling plaintiff's funds or documents in connection with the closings. Plaintiff asserted that First American was liable under this section for the fraud and dishonesty of Westminster and of Patriot Title Agency, which handled two of the four closings at issue. In order for First American to be liable under the CPLs, plaintiff must establish that it suffered actual losses arising out of the fraud or dishonesty of Westminster and Patriot in connection with the closings. The common meaning of "dishonesty" is the opposite of "honesty"; it is a disposition to lie, cheat, or steal, or a dishonest act or fraud. The plain meaning of the word "fraud" includes both actual fraud, which is an intentional perversion of the truth, and constructive fraud, which is an act of deception or a misrepresentation without an evil intent. Fraud may also be committed by suppressing facts under circumstances that establish a legal duty to make full disclosure, such as when a party has expressed to another some particularized concern or made a direct inquiry. In this case, the lower courts erred by concluding that plaintiff was required to present evidence of concealed disbursements, shortages, or unpaid prior lien holders and that First American, as a matter of law, could not be liable based on the fraud or dishonesty of Westminster and Patriot in the handling of a HUD-1 settlement statement. The case was remanded to the trial court for reconsideration of whether genuine issues of material fact remained regarding plaintiff's actual losses arising from the fraud or dishonesty of Westminster and Patriot in connection with the closings.

5. The trial court and Court of Appeals majority erred by relying on *New Freedom* to interpret the CPLs. The title insurer in *New Freedom* was liable for the actual losses arising out of the fraud or dishonesty of the issuing agent *in* handling the funds or documents in connection with the closings, whereas the CPLs at issue provided that First American was liable for actual losses arising out of fraud or dishonesty of the issuing agent handling the funds or documents in

connection with the closings. The inclusion of the word "in" in the CPLs in *New Freedom* defined, and effectively restricted, the types or categories of fraudulent or dishonest activities by a closing agent that could give rise to a right to indemnification, limiting them to conduct associated with handling the mortgage company's funds or documents. The fact that the word "in" was not included in the CPLs at issue means that the phrase simply defined or identified the closing agent, effectively broadening the indemnification coverage to any acts of fraud or dishonesty by the closing agent related to a closing. In light of this distinction, the fraud or dishonesty by Westminster or Patriot need not have been tied to their handling of plaintiff's funds or documents. As a result, plaintiff may offer evidence that Westminster and Patriot engaged in fraud or dishonesty in the handling of the HUD-1 settlement statements at closing, regardless of whether those documents belonged to plaintiff. The case was remanded to the trial court for reconsideration of whether summary disposition in favor of First American regarding its liability under the CPLs was appropriate.

Court of Appeals judgment reversed; case remanded to the trial court for reconsideration of whether summary disposition under MCR 2.116(C)(10) was appropriate under the parameters set forth in this opinion.

©2016 State of Michigan

# OPINION

Chief Justice:    Justices:
Robert P. Young, Jr.    Stephen J. Markman
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein
Joan L. Larsen

FILED April 13, 2016

STATE OF MICHIGAN

SUPREME COURT

BANK OF AMERICA, NA,

        Plaintiff-Appellant,

v                                    No. 149599

FIRST AMERICAN TITLE INSURANCE
COMPANY, PATRIOT TITLE AGENCY, KIRK
D. SCHIEB, WESTMINSTER ABSTRACT
COMPANY, WESTMINSTER TITLE AGENCY,
INC., PRIME FINANCIAL GROUP, INC.,
VALENTINO M. TRABUCCHI, PAMELA S.
NOTTURNO, f/k/a PAMELA S. SIIRA,
DOUGLAS K. SMITH, JOSHUA J. GRIGGS,
STATE VALUE APPRAISALS, LLC, NATHAN
B. HOGAN, and CHRISTINE D. MAYS,

        Defendants-Appellees,
and

FRED MATSON, MICHAEL LYNETT, JO KAY
JAMES, and PAUL SMITH,

        Defendants.
_____

BEFORE THE ENTIRE BENCH

VIVIANO, J.

    In this case, we are asked to address, among other things, the scope of the full

credit bid rule. Plaintiff has asserted a variety of claims against certain entities and

individuals involved in various allegedly fraudulent mortgage transactions. The Oakland Circuit Court granted summary disposition pursuant to MCR 2.116(C)(10) in favor of defendants as to all claims. The Court of Appeals affirmed in part and reversed in part, relying on the full credit bid rule as discussed in *New Freedom Mtg Corp v Globe Mtg Corp*[1] to conclude that certain claims raised by plaintiff were barred by plaintiff's full credit bids at the foreclosure sales.

For the reasons stated below, we conclude that the *New Freedom* panel erred to the extent it held that the full credit bid rule bars contract claims against nonborrower third parties, such as defendants in this case. Therefore, the Court of Appeals in the instant case erred by concluding that plaintiff's full credit bids barred its contract claims against the nonborrower third-party defendants. As to the other claims at issue in this appeal, we conclude that closing instructions constitute a contract upon which a breach of contract claim can be brought, and we remand to the trial court for reconsideration of whether summary disposition is appropriate on this claim. We also conclude that the lower courts erroneously interpreted the parties' closing protection letters and therefore remand to the trial court to reconsider whether summary disposition is appropriate as to plaintiff's claim under the parameters set forth in this opinion. In sum, we reverse the judgment of the Court of Appeals and remand to the Oakland Circuit Court for further proceedings consistent with this opinion.

---

[1] *New Freedom Mtg Corp v Globe Mtg Corp*, 281 Mich App 63; 761 NW2d 832 (2008).

## I. FACTS AND PROCEDURAL HISTORY

In 2005 and 2006, an independent mortgage broker submitted four loan packages to plaintiff Bank of America, NA. Bank of America agreed to finance a percentage of the borrowers' purchases of the properties. After issuing the loan commitments, Bank of America sent closing instructions to two closing agents, defendants Westminster Abstract Company (Westminster) and Patriot Title Agency (Patriot). Those closing agents agreed to close the four loans in exchange for a fee.

The closing instructions required that a closing protection letter (CPL) be issued in connection with each closing. Defendant First American Title Insurance Co (First American) was the title insurance company for all four sales and agreed to issue CPLs for all four closings. Under the CPLs, First American agreed to reimburse Bank of America for its actual losses incurred in connection with the closing if the losses arose out of, among other things, the fraud or dishonesty of the closing agents.

After First American issued the CPLs, the closings occurred. Westminster closed on loans for two of the properties: 13232 Enid Boulevard (Enid), for which Bank of America provided a $3,575,000 loan; and 1890 Heron Ridge Court (Heron Ridge), for which Bank of America provided a $2,800,000 loan. Patriot closed on loans for the other two properties: 1766 Golf Ridge Drive (Golf Ridge), for which Bank of America provided a $1,500,000 loan; and 1550 Kirkway Road (Kirkway), for which Bank of America provided a $1,500,000 loan. Unbeknownst to Bank of America, the values of the properties had been inflated by fraudulent appraisals and straw buyers who were paid for their participation. Shortly after closing, all four borrowers defaulted.

3

Bank of America foreclosed by advertisement on all four properties in accordance with Michigan's foreclosure statutes.[2] It subsequently purchased all four properties at sheriff sales with credit bids. It made full credit bids—i.e., credit bids in the full amount of the unpaid principal and interest plus foreclosure costs—on the Enid and Kirkway properties. Thereafter, Bank of America sold all the properties to bona fide purchasers.[3] Bank of America claims it lost roughly $7 million on the deals.

During the foreclosure proceedings, Bank of America discovered the underlying fraud in each of the four loans. Bank of America brought the instant suit against First American, Westminster, and Patriot, as well as several individuals involved in the closings.[4] Pertinent to this appeal, Bank of America asserted a claim against Westminster, alleging that it violated the specific terms of the closing instructions, and a claim against First American for recovery under the CPLs for the actual losses arising from Westminster's and Patriot's fraud and dishonesty during the closings.[5]

Defendants moved for summary disposition. The circuit court granted First American and Westminster summary disposition under MCR 2.116(C)(10) as to all claims and thereafter denied Bank of America's motion for reconsideration.

---

[2] MCL 600.3201 *et seq.*

[3] Bank of America sold Enid for $632,500, Heron Ridge for $1,150,000, Golf Ridge for $325,000, and Kirkway for $440,000.

[4] Patriot and all other defendants except Westminster and First American have either been defaulted or dismissed from the action.

[5] Bank of America also raised a negligent misrepresentation claim against Westminster, but subsequently voluntarily dismissed it.

4

In a split, unpublished opinion, the Court of Appeals affirmed in part and reversed in part.[6] The majority found *New Freedom* controlling. Quoting *New Freedom*, the panel defined the full credit bid rule as follows:

> "When a lender bids at a foreclosure sale, it is not required to pay cash, but rather is permitted to make a credit bid because any cash tendered would be returned to it. If this credit bid is equal to the unpaid principal and interest on the mortgage plus the costs of foreclosure, this is known as a 'full credit bid.' When a mortgagee makes a full credit bid, the mortgage debt is satisfied, and the mortgage is extinguished."[7]

Although the majority appeared to question the validity of *New Freedom*, it concluded that *New Freedom* extended the full credit bid rule to indemnity claims under CPLs. The majority first considered First American's liability under the CPLs for the closings done by Patriot. The majority concluded that genuine issues of material fact remained as to whether Patriot engaged in fraud or dishonesty at the Golf Ridge and Kirkway closings. Nonetheless, it affirmed the trial court's order granting summary disposition in favor of First American as to the claim based on the Kirkway closing. Recognizing that Bank of America made a full credit bid on the Kirkway property, the majority held that the full credit bid rule barred Bank of America's claim against First American stemming from the closing on that property.[8] The majority then turned to First American's liability regarding the Westminster closings. The majority concluded that Bank of America failed

---

[6] *Bank of America, NA v First American Title Ins Co*, unpublished opinion per curiam of the Court of Appeals, issued March 27, 2014 (Docket No. 307756).

[7] *Bank of America*, unpub op at 12, quoting *New Freedom*, 281 Mich App at 68 (citations omitted).

[8] *Id*. at 7.

5

to produce evidence to create a question of fact as to whether Westminster knew of or participated in the underlying fraud in the closings of the Enid and Heron Ridge properties. Thus, the majority held that the trial court properly granted summary disposition to First American and Westminster. Finally, the majority considered the validity of Bank of America's contract claim against Westminster.[9] The majority concluded that Bank of America did not establish a link between Westminster's alleged violations of the closing instructions and the claimed damages. Even if the majority had concluded there was a link, it also rejected Bank of America's claim against Westminster stemming from the closing on the Enid property because there were no damages due to Bank of America's full credit bid at the foreclosure sale.[10]

Bank of America sought leave to appeal in this Court. On November 19, 2014, we granted leave to appeal and asked the parties to include among the issues briefed:

> (1) whether a separate contract between the lender and the closing agent existed outside of the closing protection letters; (2) whether there was a genuine issue of material fact regarding the closing agent's violation of the terms of the lender's written closing instructions; and (3) whether the full credit bid rule of *New Freedom Mortgage Corp v Globe Mortgage Corp*,

---

[9] *Id*. at 15.

[10] Judge MURPHY concurred in part and dissented in part. He disagreed with the majority's construction of the CPLs and its analysis regarding the two closings administered by Westminster. He further disagreed with the majority's acceptance of *New Freedom* regarding the full credit bid rule. Judge MURPHY recognized that *New Freedom* required the panel to apply the full credit bid rule to the instant case, but he would have formally challenged the opinion by requesting that a conflict panel be convened. Finally, he disagreed with the majority's evaluation of Bank of America's contract claim against Westminster. *Bank of America*, unpub op at 1-5 (MURPHY, C.J., concurring in part and dissenting in part).

281 Mich App 63 (2008), is a correct rule of law and, if so, whether it applies to this case.[11]

## II. STANDARD OF REVIEW AND INTERPRETATION PRINCIPLES

We review de novo a trial court's decision regarding summary disposition.[12] The trial court granted summary disposition in favor of defendants Westminster and First American under MCR 2.116(C)(10). A motion brought under MCR 2.116(C)(10) "tests the factual sufficiency of the complaint."[13] In resolving such a motion, "a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties . . . in the light most favorable to the party opposing the motion."[14] If the evidence fails to establish a genuine issue regarding any material fact, the movant is entitled to judgment as a matter of law.[15]

We also review de novo questions of statutory interpretation and contractual interpretation.[16] To the extent this case requires the interpretation of a statute, our goal in interpreting a statute is to give effect to the Legislature's intent, focusing first on the statute's plain language.[17] When a statute's language is unambiguous, the Legislature

---

[11] *Bank of America, NA v First American Title Ins Co*, 497 Mich 896 (2014).

[12] *Elba Twp v Gratiot Co Drain Comm'r*, 493 Mich 265, 277-278; 831 NW2d 204 (2013).

[13] *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999).

[14] *Id*.

[15] *Id*.

[16] *Manuel v Gill*, 481 Mich 637, 643; 753 NW2d 48 (2008).

[17] *Madugula v Taub*, 496 Mich 685, 696; 853 NW2d 75 (2014).

must have intended the meaning clearly expressed, and the statute must be enforced as written.[18]  No further judicial construction is required or permitted.[19]  To the extent this case requires the interpretation of a contract, our primary goal in interpreting any contract is to give effect to the parties' intentions at the time they entered into the contract.[20]  We determine the parties' intent by interpreting the language of the contract according to its plain and ordinary meaning.[21]  If the language of a contract is unambiguous, we must enforce the contract as written.[22]

## III.  ANALYSIS

### A.  WHETHER THE FULL CREDIT BID RULE BARS CONTRACT CLAIMS AGAINST NONBORROWER THIRD PARTIES

We turn first to Bank of America's contention that the Court of Appeals erred by holding that the full credit bid rule barred its claims against Westminster and First American.  As discussed previously, in reaching this conclusion, the Court of Appeals relied on *New Freedom*, which held that the full credit bid rule bars fraud and contract claims brought by the mortgagee against nonborrower third parties.[23]  Bank of America argues that *New Freedom* was incorrectly decided and should be overruled.

---

[18] *Id.*

[19] *Id.*

[20] *Miller-Davis v Ahrens Constr, Inc*, 495 Mich 161, 174; 848 NW2d 95 (2014).

[21] *Id.*

[22] See *In re Smith Trust*, 480 Mich 19, 24; 745 NW2d 754 (2008).

[23] Because *New Freedom* was published, the Court of Appeals panel in the instant case was bound by it.  See MCR 7.215(C)(2).

As noted earlier, Bank of America foreclosed by advertisement on all four properties at issue in accordance with Michigan's foreclosure statutes.[24] Under our foreclosure by advertisement scheme, a mortgagee may foreclose by advertisement "[e]very mortgage of real estate, which contains a power of sale, upon default being made in any condition of such mortgage."[25] The statutes prescribe, among other things, the circumstances that must exist before foreclosure by advertisement can occur,[26] the procedure that the mortgagee must follow,[27] and the mortgagor's right of redemption.[28]

As part of this statutory scheme, the Michigan Legislature enacted MCL 600.3280, Michigan's anti-deficiency statute.[29] If a mortgagee sues a debtor to recover a deficiency

---

[24] MCL 600.3201 *et seq.*

[25] MCL 600.3201.

[26] MCL 600.3204.

[27] See, e.g., MCL 600.3212 and MCL 600.3216.

[28] See, e.g., MCL 600.3240.

[29] MCL 600.3280 reads in pertinent part:

> When, in the foreclosure of a mortgage by advertisement, any sale of real property has been made after February 11, 1933, or shall be hereafter made by a mortgagee, trustee, or other person authorized to make the same pursuant to the power of sale contained therein, at which the mortgagee, payee or other holder of the obligation thereby secured has become or becomes the purchaser, or takes or has taken title thereto at such sale either directly or indirectly, and thereafter such mortgagee, payee or other holder of the secured obligation, as aforesaid, shall sue for and undertake to recover a deficiency judgment against the mortgagor, trustor or other maker of any such obligation, or any other person liable thereon, it shall be competent and lawful for the defendant against whom such deficiency judgment is sought to allege and show as matter of defense and set-off to the extent only of the amount of the plaintiff's claim, that the property sold

9

judgment, the anti-deficiency statute allows the debtor to defend the suit by showing "that the property sold was fairly worth the amount of the debt secured by it at the time and place of sale or that the amount bid was substantially less than its true value."[30] Such a showing will "defeat the deficiency judgment against [the debtor], either in whole or in part . . . ."[31]

A mortgagee that elects to foreclose by advertisement may bid on the property at the sale,[32] and a mortgagee who does so "stands in the position of an ordinary purchaser . . . ."[33] However, unlike a third-party purchaser, a mortgagee is not required to make a cash bid. Instead, a mortgagee can make a bid on credit because any cash it tenders would be returned to it, and thus "[a]ctual payment to the sheriff would [be] an idle gesture."[34]

---

was fairly worth the amount of the debt secured by it at the time and place of sale or that the amount bid was substantially less than its true value, and such showing shall constitute a defense to such action and shall defeat the deficiency judgment against him, either in whole or in part to such extent.

[30] MCL 600.3280. Anti-deficiency statutes like MCL 600.3280 were enacted in response to the Great Depression as an attempt "to address the ever-growing number of foreclosures and the effect they had on the grim residential real estate situation." Wright, *The Effect of New Deal Real Estate Residential Finance and Foreclosure Policies Made in Response to the Real Estate Conditions of the Great Depression*, 57 Ala L Rev 231, 240-241 (2005). Michigan's original anti-deficiency statute was enacted by 1937 PA 143 and made retroactive to February 11, 1933.

[31] MCL 600.3280.

[32] *Pulleyblank v Cape*, 179 Mich App 690, 693; 446 NW2d 345 (1989).

[33] *Senters v Ottawa Sav Bank, FSB*, 443 Mich 45, 50; 503 NW2d 639 (1993).

[34] *Griffin v Union Guardian Trust Co*, 261 Mich 67, 69; 245 NW 572 (1932); see also *Feldman v Equitable Trust Co*, 278 Mich 619; 270 NW 809 (1937).

A mortgagee who bids on the property at a foreclosure sale is not required to bid the full amount of the debt.[35] If a mortgagee bids a lower amount, it may then pursue a deficiency judgment against the debtor, subject to the limitations set forth in the anti-deficiency statute.[36] However, a mortgagee can make a full credit bid—i.e., a credit bid "in an amount equal to the unpaid principal and interest of the mortgage debt, together with costs, fees, and other expenses of the foreclosure."[37] If a mortgagee's "full credit bid is successful, i.e., results in the acquisition of the property, the lender pays the full outstanding balance of the debt and costs of the foreclosure to itself and takes title to the security property, releasing the borrower from further obligations under the defaulted note."[38]

Under the full credit bid rule, a lender who takes title following a full credit bid "is precluded for purposes of collecting its debt from later claiming that the property is actually worth less than the bid."[39] This is because the mortgagee who enters such a bid

---

[35] *Bankers Trust Co of Detroit v Rose*, 322 Mich 256, 261; 33 NW2d 783 (1948) (stating that the anti-deficiency statute "nowhere required [the mortgagee] to bid the full amount of the debt as a condition of bidding at the foreclosure proceedings").

[36] See MCL 600.3280.

[37] *Alliance Mtg Co v Rothwell*, 10 Cal 4th 1226, 1238; 44 Cal Rptr 2d 352; 900 P2d 601 (1995). See also 55 Am Jur 2d, Mortgages, § 524, pp 243-244.

[38] *Id*. See also 55 Am Jur 2d, Mortgages, § 524, pp 243-244.

[39] *Alliance Mtg Co*, 10 Cal 4th at 1238. See also *Titan Loan Investment Fund, LP v Marion Hotel Partners, LLC*, 891 NE2d 74, 77 (Ind App, 2008) ("[The mortgagee] cannot bid and pay its entire judgment, interest, and costs at a sheriff's sale and then repudiate its bid in subsequent proceedings any more than a disinterested third party could have bid the same amount in cash and subsequently asked for a refund.").

is deemed "to have irrevocably warranted that the value of the security foreclosed upon was equal to the outstanding indebtedness and not impaired."[40]  Thus, the full credit bid rule "makes a properly conducted nonjudicial foreclosure sale the dispositive device through which to resolve the question of value."[41]  And, in its most direct application, the rule bars a mortgagee who takes title at a nonjudicial foreclosure sale following a full credit bid from pursuing a deficiency judgment against the mortgagor.[42]

However, courts have recognized the applicability of the full credit bid rule in other contexts.  For example, in *Smith v General Mtg Corp*, although not referring to the rule by its name, we considered the full credit bid rule in the context of the mortgagee's right to recover insurance proceeds for a loss occurring before the foreclosure sale.[43]  There, the mortgagee submitted a bid on the property at a foreclosure sale for the full amount of the debt plus foreclosure costs.  A fire had previously destroyed the house.  Six

---

[40] 55 Am Jur 2d, Mortgages, § 524, p 244.

[41] *Kolodge v Boyd*, 88 Cal App 4th 349, 356-357; 105 Cal Rptr 2d 749 (2001) (quotation marks and citation omitted).

[42] See *Pulleyblank*, 179 Mich App at 695 (concluding that the mortgagee's full credit bid "constituted full satisfaction of all indebtedness" and that "[i]t would defy logic to allow [the mortgagee] to bid an inflated price on a piece of property to ensure that they would not be overbid and . . . to then claim that the 'true value' was less than half of the value of the bid").

[43] *Smith*, 402 Mich at 125.  The full credit bid rule has also been invoked in actions to recover for the waste of the mortgagor—see, e.g., *Cornelison v Kornbluth*, 15 Cal 3d 590; 125 Cal Rptr 557; 542 P2d 981 (1975); see also *Janower v FM Sibley Lumber Co*, 245 Mich 571, 573-574; 222 NW 736 (1929)—and actions claiming fraud by the mortgagor or other parties in inducing the mortgagee to make the loan; see *Alliance Mtg Co*, 10 Cal 4th 1226; but see *Chrysler Capital Realty, Inc v Grella*, 942 F2d 160 (CA 2, 1991).

12

months after the foreclosure, the mortgagee received the insurance proceeds. The mortgagors (i.e., the defaulting homeowners) sued to recover the insurance proceeds from the mortgagee. The mortgagors argued that they were entitled to the insurance proceeds because the mortgage debt was extinguished when the mortgagee bid in the amount of the debt at the foreclosure sale. The mortgagee argued that, because the property was nearly worthless, it was entitled to the proceeds.

The *Smith* Court recognized that the loss occurred before the mortgage sale and that "[a]lthough the mortgagee was entitled to the insurance proceeds to reduce the debt or repair the property, it instead purchased the property at the foreclosure sale."[44] It stated, "[W]hen the loss occurs before a foreclosure sale in which the mortgagee purchases the property for a bid which extinguishes the mortgage debt, the mortgagee is not entitled to the insurance proceeds."[45] It then concluded:

> "No one disputes that the mortgagee is entitled to recover only his debt. Any surplus value belongs to others, namely, the mortgagor or subsequent lienors. Indeed, it is not conceivable that the mortgagee could recover a deficiency judgment against the mortgagor if it had bid in the full amount of the debt at foreclosure sale. To allow the mortgagee, after effectively cutting off or discouraging lower bidders, to take the property and then establish that it was worth less than the bid encourages fraud, creates uncertainty as to the mortgagor's rights, and most unfairly deprives the sale of whatever leaven comes from other bidders."[46]

---

[44] *Smith*, 402 Mich at 128.

[45] *Id*.

[46] *Id*. at 128-129, quoting *Whitestone Savings & Loan Ass'n v Allstate Ins Co*, 28 NY2d 332, 336-337; 321 NYS2d 862; 270 NE2d 694 (1971) (emphasis omitted). Although it adopted the rule for future cases, the Court declined to apply the full credit bid rule to the case before it, concluding that "[e]nforcement of this previously unannounced rule would confer an unearned benefit on plaintiffs." *Id*. at 130.

In this case, we must determine whether the full credit bid rule applies to bar contract claims against nonborrower third parties. This brings us to *New Freedom*, which was the first case in Michigan to address the full credit bid rule in this context.

In *New Freedom*, the plaintiff funded two mortgage loans.[47] Similar to the instant case, CPLs were issued in conjunction with the loans. Eventually, the borrowers defaulted on the loans, and a subsequent assignor foreclosed on the properties, making full credit bids. The assignor was indemnified by the plaintiff through an indemnity agreement. The plaintiff filed suit against several of the entities involved in the loans and the closings, arguing, among other things, that the title insurer was liable under the parties' CPLs for the fraudulent or dishonest acts or omissions of the closing agents. The trial court agreed that the title insurer, through the closing agents, had violated the CPLs, but found no liability because the plaintiff suffered no damages as a result of the assignor's full credit bid, which satisfied the debt.[48]

On appeal, much of the Court of Appeals' focus was on determining whether the full credit bid rule applied to bar fraud claims. In considering this issue, the Court reviewed a litany of cases from within and without this state discussing the full credit bid rule.[49] The panel concluded that the cases stood for multiple propositions, including that the full credit bid rule applied to actions brought by the mortgagee for fraud.[50] And, after

---

[47] *New Freedom*, 281 Mich App at 65-67.

[48] *Id*.

[49] *Id*. at 70-74.

[50] *Id*. at 74. Whether the full credit bid rule bars fraud claims against the mortgagor or nonborrower third parties is not before us today. While Bank of America originally

14

reviewing two California cases, the panel held that the full credit bid rule precluded fraud actions against nonborrower third parties.[51] Later, the panel extended this conclusion by applying the full credit bid rule to bar the plaintiff's contract claims against nonborrower third parties as well.[52] In sum, the panel concluded that, in light of the full credit bids at the foreclosure sale, the plaintiff's claims against the nonborrower third parties (i.e., the appraiser, the closing agents, and the title insurer that issued the CPLs) were barred by the full credit bid rule.[53]

In determining that the full credit bid rule bars claims against nonborrower third parties, the *New Freedom* panel distinguished *Alliance Mortgage v Rothwell*,[54] and relied on *Pacific Inland Bank v Ainsworth*.[55] We will discuss each of those cases in turn to determine whether they support this conclusion.

In *Alliance Mortgage*, the California Supreme Court considered the effect of a mortgagee's full credit bid on a claim of fraud in the inducement of the underlying loan obligation against the nonborrower, third-party defendants.[56] After a lengthy review of

---

brought a fraud claim against Westminster for negligent misrepresentation, the claim has been dismissed. Only Bank of America's contract claims under the closing instructions and the closing protection letters remain.

[51] *Id*. at 73-74, citing *Alliance Mtg Co*, 10 Cal 4th 1226, and *Pacific Inland Bank v Ainsworth*, 41 Cal App 4th 277; 48 Cal Rptr 2d 489 (1995).

[52] *New Freedom*, at 76-77.

[53] *Id*. at 74-75.

[54] *Alliance Mtg Co*, 10 Cal 4th 1226.

[55] *Pacific Inland Bank*, 41 Cal App 4th 277.

[56] *Alliance Mtg Co*, 10 Cal 4th at 1231.

15

California's anti-deficiency statute, the full credit bid rule, and the applicable caselaw, the Court concluded that the mortgagee's full credit bids did not, as a matter of law, bar its fraud claims against the defendants, as long as the mortgagee could establish that "its full credit bids were a proximate result of defendants' fraud, and that in the absence of such fraud it would not, in all reasonable probability, have made the bids."[57] In so doing, it recognized that "[t]he full credit bid rule was not intended to immunize wrongdoers from the consequences of their fraudulent acts."[58]

Although *Alliance Mortgage* militates against *New Freedom*'s conclusion that the full credit bid rule bars claims against nonborrower third parties, the *New Freedom* panel found *Alliance Mortgage* distinguishable, stating as follows: "[G]iven the lender's alleged fiduciary relationship with the defendants and the fact that it did not discover the alleged fraud until after the foreclosure sale, [*Alliance Mortgage*] held that the full credit bid rule did not, as a matter of law, bar its claims."[59] The panel concluded that *Alliance Mortgage* did not control the case before it because there were no allegations of a fiduciary relationship between the plaintiff and the nonborrower third parties in *New Freedom*.[60] However, the *Alliance Mortgage* Court specifically stated that the existence

---

[57] *Id*. at 1246-47.

[58] *Id*. Two concurring justices would have held that the full credit bid rule does not apply in the context of fraud claims against nonborrower third parties because such claims are not an attempt to collect on the debt, which is the predicate for the application of the rule. See *id*. at 1251-1254.

[59] *New Freedom*, 281 Mich App at 73.

[60] *Id*.

of a fiduciary relationship, or lack thereof, had no effect on its conclusion that the full credit bid rule does not, as a matter of law, bar fraud claims against nonborrower third parties.[61] Thus, we find *New Freedom*'s attempt to distinguish *Alliance Mortgage* unpersuasive.

In *Pacific Inland Bank*, the California Court of Appeals concluded that the full credit bid rule barred a negligence action against an appraiser and his company—i.e., nonborrower third parties.[62] The panel concluded that *Alliance Mortgage* only created an exception to the full credit bid rule for fraud claims against nonborrower third parties and thus concluded that, "absent a fraud claim, a full credit bid estops a plaintiff from establishing damages."[63]

However, more than one court has called into question the holding of *Pacific Inland Bank*. For example, in *In re King Street Investments*, the Court concluded that *Pacific Inland Bank*'s holding was not only inconsistent with *Alliance Mortgage* but also contrary to the purpose of the full credit bid rule and California's anti-deficiency statute because "[n]either the rule nor the statutes are concerned about the relationship between a third-party nonborrower and a lender."[64]

Similarly, in *Kolodge v Boyd*, the California Court of Appeals declined to follow *Pacific Inland Bank*, in determining whether the full credit bid rule barred claims of fraud

---

[61] *Alliance Mortgage Co*, 10 Cal 4th at 1246 n 8.

[62] *Pacific Inland Bank*, 41 Cal App 4th at 279.

[63] *Id*. at 283.

[64] *In re King Street Investments*, 219 BR 848, 855 (Bankr CA 9, 1998).

and negligence against an appraiser (i.e., a nonborrower third party).[65] In holding that the rule does not bar such claims, the Court noted that, although *Alliance Mortgage* only considered the full credit bid rule in relation to fraud claims, "the rationale of *Alliance*, as well as the authorities the court relied upon, strongly suggest such bids also do not as a matter of law bar any other tort claims against third parties who are not borrowers . . . ."[66] The panel recognized that the full credit bid rule was designed "to ensure the integrity of nonjudicial foreclosure sales insofar as such sales may relate to the debtor protection policies of the antideficiency statutes."[67] Further, "[l]ike the antideficiency statutes, the full credit bid rule is not concerned about the relationship between the lender and third parties but only the relationship between the lender and the borrower . . . ."[68] After reviewing *Cornelison v Kornbluth*, which established the full credit bid rule in California, the Court observed that it provided "no reason to think a full credit bid establishes the value of the property for any purpose other than a determination whether the borrower subject to the lien has satisfied the secured obligation."[69] Then, after analyzing *Pacific Inland Bank*, the Court concluded that the case was "wrongly decided and decline[d] to

---

[65] *Kolodge*, 88 Cal App 4th at 370. California Courts of Appeals are not bound by Court of Appeals' decisions from other districts or divisions. See *Jessen v Mentor Corp*, 158 Cal App 4th 1480, 1489 n 10; 71 Cal Rptr 3d 714 (2008).

[66] *Kolodge*, 88 Cal App 4th at 364.

[67] *Id*. at 356.

[68] *Id*. at 365-366.

[69] *Id*. at 368, citing *Cornelison v Kornbluth*, 15 Cal 3d 590.

18

follow it," noting that the "[a]pplication of the rule to bar claims against tortfeasors not party to the note goes far beyond the purpose of the rule and is simply irrational."[70]

Unlike the Court in *New Freedom*, we decline to rely on *Pacific Inland Bank* to extend the full credit bid rule to bar claims against nonborrower third parties. Instead, we are persuaded by *Alliance Mortgage* and *Kolodge*. As those courts recognized, the full credit bid rule is related to the anti-deficiency statute, and its purpose is merely to resolve the question of the value of the property for purposes of determining whether the mortgage debt was satisfied. It is not concerned with the relationship between the lender and third parties and was simply not intended to cut off all remedies a mortgagee might have against nonborrower third parties.[71]

This is confirmed when the full credit bid rule is considered within our jurisprudence, as well as in relation to the claims at issue in this case. In Michigan, although the right to foreclose by advertisement is statutory,[72] "[s]tatutory foreclosures are a matter of contract, authorized by the mortgagor[.]"[73] As a result, the proceedings

---

[70] *Id*. at 370.

[71] One could argue (although no party does) that the full credit bid rule/insurance proceeds cases require a different result. These cases, which often involve a claim by a mortgagee against the insurer (i.e., a nonborrower third party), hold that such claims are barred by the full credit bid rule. See, e.g., *Heritage Fed Savings Bank v Cincinnati Ins Co*, 180 Mich App 720; 448 NW2d 39 (1989). However, we do not find these cases controlling in this context because, in an action to recover insurance proceeds, the crux of the dispute is whether the mortgagee or mortgagor is entitled to the proceeds (regardless of whether the mortgagor is made a party to the action). By contrast, in the instant case, the rights of the mortgagor are not at issue.

[72] *Calaveras Timber Co v Mich Trust Co*, 278 Mich 445, 450; 270 NW 743 (1936).

[73] *White v Burkhardt*, 338 Mich 235, 239; 60 NW2d 925 (1953).

19

are limited to resolving the rights and remedies of the parties to the contract—i.e., the mortgagee and the mortgagor.[74] Moreover, the Legislature's intent in enacting the foreclosure by advertisement statutes was, in part, to protect the mortgagor by not allowing the mortgagee a double recovery.[75]

Likewise, when enacting Michigan's anti-deficiency statute, the Legislature clearly limited its effect to the rights of the parties to the mortgage debt. We have recognized that the Legislature enacted the anti-deficiency statute in an attempt "to safeguard *the rights of the debtor* and secure to the creditor that which is his due."[76] Indeed, only "the mortgagor, trustor or other maker of any such obligation, or any other person liable thereon" may defend against a mortgagee's suit to recover a deficiency by showing "that the property sold was fairly worth the amount of the debt secured by it at the time and place of sale or that the amount bid was substantially less than its true value[.]"[77]

---

[74] See 54A Am Jur 2d, Mortgages, § 19, p 610 ("An instrument cannot operate as a mortgage unless there exist, as parties thereto, both a mortgagor and a mortgagee.").

[75] *Church & Church, Inc v A-1 Carpentry*, 281 Mich App 330, 341; 766 NW2d 30 (2008), vacated in part on other grounds 483 Mich 885 (2009).

[76] *Guardian Depositors Corp v Powers*, 296 Mich 553, 561; 296 NW 675 (1941) (emphasis added). See also *Bankers Trust Co of Detroit v Rose*, 322 Mich 256, 260; 33 NW2d 783 (1948) (stating that the purpose of the anti-deficiency statute is "to prevent a mortgagee from obtaining judgment for a deficiency where the mortgagee had obtained by way of foreclosure the actual title to premises which were of greater value than the amount of the debt secured by the mortgage.").

[77] MCL 600.3280.

Further, holding that Bank of America's full credit bids meant that it suffered no damages whatsoever and thus could not recover under any theory would impinge on the parties' ability to contract as they see fit and would nullify the protections for which Bank of America contracted.[78] Through the contracts at issue, Bank of America sought to protect itself from the very activity that allegedly occurred in this case—fraud by those individuals involved in closing the mortgage. Bank of America's ability to recover under the contracts is not limited by its bids on the properties; instead, as discussed later in this opinion, the parties agreed that Bank of America could recover for *any loss* resulting from Westminster's failure to follow the closing instructions and its *actual losses* arising out of the fraud or dishonesty of Westminster in connection with the closings. Bank of America has presented evidence that it suffered actual losses when it sold the properties for much less than the amounts of the loans provided. We see no justification for limiting or nullifying Bank of America's contractual rights by application of a rule designed to determine Bank of America's rights in relation to the mortgagors.

In sum, although the full credit bid rule is not a creature of statute, we are cognizant of its relationship to the foreclosure by advertisement and anti-deficiency statutes. Those statutes are carefully designed to govern the relationship between, and establish the rights and liabilities of, the mortgagee and mortgagor—not nonborrower

---

[78] See *Bloomfield Estates Improvement Ass'n v Birmingham*, 479 Mich 206, 212; 737 NW2d 670 (2007) (recognizing that the freedom of contract is deeply entrenched in the common law and the right to make and enforce contracts is among the fundamental rights which are the essence of civil freedom).

21

third parties.[79] Like the courts in *Alliance Mortgage* and *Kolodge*, we conclude that there is no justification for extending the protections of the rule to alter the contractual rights and liabilities between a mortgagee and nonborrower third parties. Therefore, we hold that the full credit bid rule does not bar contract claims by a mortgagee against nonborrower third parties, and we overrule *New Freedom* to the extent that it conflicts with our decision today.

In the instant case, the Court of Appeals majority erred by concluding that the full credit bid rule barred Bank of America's claims against Westminster and First American stemming from the Kirkway and Enid closings. Instead, we agree with the Court of Appeals dissent that, while it is undisputed that Bank of America made full credit bids on those properties, the full credit bid rule does not bar Bank of America's contract claims against nonborrower third parties such as Westminster and First American.

## B. LIABILITY UNDER THE CLOSING INSTRUCTIONS

Having determined that the full credit bid rule does not automatically preclude recovery for Bank of America, we now turn to the viability of Bank of America's contract claims. We first consider Bank of America's breach of contract claim against

---

[79] For these reasons, we agree with the dissenting judge's conclusion that "the full credit bid rule and anti-deficiency statutes are not concerned about the relationship between a lender and a third-party nonborrower; rather, they are designed to protect debtors or borrowers by restricting the remedies available to secured creditors for defaulted debts secured by mortgages or deeds of trust." *Bank of America*, unpub op at 4 (MURPHY, C.J., concurring in part and dissenting in part), citing *In re King Street Investments*, 219 BR 848.

Westminster for not complying with the specific provisions of the closing instructions at the Enid and Heron Ridge closings.

The closing instructions for the two closings performed by Westminster contain similar language. Among other things, the instructions required Westminster to contact Bank of America immediately if it could not comply with the instructions. Importantly, the instructions read, "As a closing agent you are financially liable for any loss resulting from your failure to follow these Instructions." The instructions could not be verbally altered; any alterations or amendments had to be in writing and faxed as necessary with a confirmation receipt. Any changes approved by Bank of America had to be initialed by all signatories. In addition, Bank of America had to approve the HUD-1 settlement statement before closing.

To prevail on its claim for breach of contract against Westminster for violation of these contracts, Bank of America must establish by a preponderance of the evidence that (1) there was a contract, (2) the other party breached the contract, and (3) the breach resulted in damages to the party claiming breach.[80] The parties quarrel over the first element—whether the closing instructions constitute contracts upon which a claim may be brought.[81]

---

[80] *Miller-Davis*, 495 Mich at 178.

[81] This is a matter of first impression in Michigan. However, we note that many courts have recognized that closing instructions may constitute contracts. See, e.g., *Plaza Home Mtg Inc v North American Title Co, Inc*, 184 Cal App 4th 130, 139; 109 Cal Rptr 3d 9 (2010) (indicating that the lender and the closing agent "had a direct contractual relationship arising from the closing instructions"); *FDIC v US Titles, Inc*, 939 F Supp 2d 30, 38-40 (D DC, 2013) (recognizing that violation of closing instructions can lead to a viable breach of contract claim); *FDIC v Floridian Title Grp*, 972 F Supp 2d 1289, 1295

"A valid contract requires five elements: (1) parties competent to contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation."[82] The parties do not dispute that they were competent to contract or that loan closings are a proper subject matter for a contract. In addition, there is no question regarding the existence of legal consideration. In order for consideration to exist, there must be a bargained-for exchange—"a benefit on one side, or a detriment suffered, or service done on the other."[83] Here, Westminster received a fee in exchange for handling the Enid and Heron Ridge closings, thus satisfying the consideration requirement. Further, there was mutuality of agreement and mutuality of obligation. Bank of America submitted the closing instructions to Westminster, and Westminster agreed to the closing instructions by performing the closings for Bank of America. Further, Westminster acknowledged that it understood its obligations under the closing instructions, and indeed agreed to perform those obligations—the closing agent signed in acknowledgement that "I have closed this loan in accordance with the foregoing Instructions. I CERTIFY COMPLIANCE WITH ALL OF THE CONDITIONS OUTLINED IN THESE INSTRUCTIONS."

As a result, the closing instructions in the instant case satisfied all the elements of a valid contract. Therefore, we hold that closing instructions can constitute a contract,

---

(SD Fla, 2013) (concluding that the FDIC presented evidence that the closing instructions constituted a contract).

[82] *AFT Mich v Michigan*, 497 Mich 197, 235; 866 NW2d 782 (2015).

[83] *Gen Motors Corp v Dep't of Treasury*, 466 Mich 231, 239; 644 NW2d 734 (2002) (quotation marks and citation omitted).

and that the closing instructions between Bank of America and Westminster do, in fact, constitute contracts upon which a breach of contract action may lie.

Nonetheless, the Court of Appeals concluded that, to the extent the closing instructions constituted contracts, Westminster's duties under the contracts were specifically modified and limited by the CPLs between Bank of America and First American. We disagree.

Parties to a contract are at liberty to modify or waive the rights and duties established by a contract.[84] Further, "a modification or waiver can be established by clear and convincing evidence that the parties mutually agreed to a modification or waiver of the contract."[85] But a party cannot "*unilaterally* alter an existing bilateral agreement."[86] Instead, a party alleging a modification of a contract "must establish a mutual intention of the parties to waive or modify the original contract."[87] "This principle follows from the contract formation requirement that is elementary to the exercise of one's freedom to contract: mutual assent."[88]

Under these well-recognized principles, the CPLs in the instant case could not have modified the closing instructions between Bank of America and Westminster.

---

[84] See *Quality Prods and Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 372; 666 NW2d 251 (2003).

[85] *Id*.

[86] *Id*.

[87] *Id*.

[88] *Id*.

Nothing in the contract purports to limit and modify Westminster's duties as the closing agent. Instead, the contract merely provides the limitations on First American's agreement to indemnify Bank of America for any errors arising from the closing on behalf of the closing agent (Westminster). Most importantly, even if the CPLs did purport to modify Westminster's duties under the closing instructions, the CPLs are contracts between First American and Bank of America *only*. As Westminster is not a party to the CPLs, it cannot be that the CPLs modified *Westminster's* obligations under the closing instructions because Bank of America and Westminster did not mutually agree to modify the obligations under the closing instructions. Because mutuality is a necessary predicate to the modification of a contract,[89] the Court of Appeals erred to the extent it concluded that the contracts between Bank of America and Westminster were modified by the CPLs between Bank of America and First American.

Having clarified the contractual relationship between Bank of America and Westminster, we decline to decide whether summary disposition is appropriate on this claim at this time. Instead, we vacate the entirety of the Court of Appeals' analysis of the issue, because of its erroneous belief that the closing instructions were modified by the CPLs. Moreover, the trial court's only mention of this claim in its opinion and order was that, under *New Freedom*, there was no breach of contract by defendant Westminster. However, *New Freedom* did not involve a breach of contract claim based on the closing instructions and thus does not control the instant issue. Therefore, we remand to the trial court for it to reconsider, under the parameters set forth in this opinion, whether summary

___

[89] See *id*.

26

disposition under MCR 2.116(C)(10) is appropriate as to Bank of America's claim for breach of contract against Westminster.

## C. LIABILITY UNDER THE CLOSING PROTECTION LETTERS

We turn next to Bank of America's claim against First American for liability under the closing protection letters.

A CPL "is a contract between the title company and the lender whereby the title insurance company agrees to indemnify the lender for any losses caused by the failure of the title agent to follow the lender's closing instructions."[90] A CPL "is necessary because, while a title agent is the agent of the title insurance company for purposes of selling the title insurance policy (and binding the company to the insurance contract), that agency relationship does not extend to the title agent's conduct at the closing."[91] As a result, "[a] lender who also wants the title insurer to be responsible for the agent's acts in connection with escrow closing activities and services must separately contract with the title insurer for such additional protection by entering into an 'insured closing letter' or 'closing protection letter.' "[92]

Under the CPLs in the instant case, First American agreed to reimburse Bank of America for

> actual loss incurred by [Bank of America] in connection with such closings
> when conducted by the Issuing Agent (an Agent authorized to issue title

---

[90] *In re Lowenstein*, 459 BR 227, 236 (ED Penn, 2011).

[91] *Id*.

[92] *Id*. (quotation marks and citation omitted).

27

insurance for the Company), referenced herein and when such loss arises out of:

1. Failure of the Issuing Agent to comply with your written closing instructions to the extent that they relate to (a) the status of the title to said interest in land or the validity, enforceability and priority of the lien of said mortgage on said interest in land, including the obtaining of documents and the disbursement of funds necessary to establish such status of title or lien, or (b) the obtaining of any other document, specifically required by you, but not to the extent that said instructions require a determination of the validity, enforceability or effectiveness of such other document, or (c) the collection and payment of funds due you, or

2. Fraud or dishonesty of the Issuing Agent handling your funds or documents in connection with such closings.[93]

Bank of America only asserts that First American is liable under § 2 for the fraud and dishonesty of Westminster and Patriot in connection with the four closings.[94]

On this issue, the trial court concluded that First American was not liable under § 2 of the CPLs because Bank of America "failed to present any evidence of concealed disbursements, shortages or unpaid prior lien holders." Further, the trial court stated, "The Court of Appeals in *New Freedom* specifically found that any misrepresentation on the HUD-1 settlement is not fraud in the handling of the lender's document." Because it appears that the trial court misinterpreted the parties' contracts, we clarify the circumstances under which First American may be liable under the CPLs.

---

[93] Westminster and Patriot are the Issuing Agents mentioned in the language of the CPLs.

[94] In its order granting summary disposition, the trial court held that First American was not liable under subsection (1) of the CPLs. We need not consider this issue because, as Bank of America readily admits, it never argued before the trial court that First American was liable under subsection (1), nor does it attempt to do so now.

28

As mentioned previously, we enforce a contract as written.[95] Section 2 can be broken down into two parts: (1) fraud or dishonesty (2) of the Issuing Agent handling your funds or documents in connection with such closings. Considering the latter clause first, it is clear that Westminster and Patriot are the Issuing Agents "handling your funds or documents in connection with such closings." Therefore, in order for First American to be liable under the CPLs, Bank of America must establish that it suffered actual losses arising out of the fraud or dishonesty of Westminster and Patriot in connection with the closings.

The Court of Appeals in this case recognized that the terms "fraud or dishonesty" were quite broad. The Court stated:

> The common meaning of "dishonesty" is the opposite of "honesty;" it is "a disposition to lie, cheat, or steal" or a "dishonest act; fraud." *Random House Webster's College Dictionary* (1992), p 385. Our Supreme Court in *General Electric Credit Corp v Wolverine Ins Co*, 420 Mich 176, 179, 188; 362 NW2d 595 (1984), discussed the "natural, common, ordinary, and primarily understood meaning" of the word "fraud," as used in MCL 257.248 requiring a surety bond of motor vehicle dealers providing indemnification of certain persons for loss "caused through fraud, cheating, or misrepresentation in the conduct of the vehicle business." The Court noted that the "natural, common, and ordinarily understood definition of the word 'fraud' embraces both actual and constructive fraud." *General Electric Credit Corp*, 420 Mich at 188. Thus, the plain meaning of "fraud" includes "both actual fraud—an intentional perversion of the truth—and constructive fraud—an act of deception or a misrepresentation without an evil intent." *Amco Builders & Developers, Inc v Team Ace Joint Venture*, 469 Mich 90, 101 n 2; 666 NW2d 623 (2003) (Young, J., *concurring*). Fraud may also be committed by suppressing facts—silent fraud—where circumstances establish a legal duty to make full disclosure. *Id.*, citing *Hord v Environmental Research Institute of Michigan (After Remand)*, 463 Mich 399, 412; 617 NW2d 543 (2000). Such a duty of full disclosure may

---

[95] *In re Smith Trust*, 480 Mich at 24.

arise when a party has expressed to another "some particularized concern or made a direct inquiry." *M & D, Inc v McConkey*, 231 Mich App 22, 29; 585 NW2d 33 (1998).[96]

Neither party quarrels with the Court of Appeals' construction of these words. And because we believe it to be a proper interpretation of the words "fraud or dishonesty" as contained in the CPLs, we adopt the analysis in full.

Notwithstanding the unambiguous language of the parties' CPLs, the trial court and the Court of Appeals majority imposed additional requirements on Bank of America not found in the plain language of the parties' contracts, including (1) that Bank of America must present evidence of concealed disbursements, shortages, or unpaid prior lien holders and (2) that First American, as a matter of law, could not be liable based on the fraud or dishonesty of Westminster and Patriot in the handling of a HUD-1 settlement statement.

First, it is unclear why the trial court concluded that Bank of America must present evidence of concealed disbursements, shortages, or unpaid prior lien holders in order to recover for the fraud or dishonesty by Westminster or Patriot. Given that no such restrictions are found in § 2 of the parties' CPLs, the trial court erred by reading them into the parties' contract. Again, as discussed earlier, Bank of America must only establish that it suffered actual losses arising out of the fraud or dishonesty of Westminster or Patriot in connection with the closings.

Second, the lower courts' conclusions regarding the HUD-1 settlement statements appear to stem from their reliance on *New Freedom*, which also considered a title

---

[96] *Bank of America*, unpub op at 8-9.

30

insurer's liability under a CPL. In *New Freedom*, the CPLs stated that the title insurer was liable for actual losses arising out of the "[f]raud or dishonesty of the Issuing Agent *in* handling your funds or documents in connection with such closings."[97] The panel interpreted this phrase to mean that the title insurer was only liable for the fraud or dishonesty of the closing agent *in handling the lender's funds or documents in connection with the closings*. The panel recognized that "[a]lthough there were discrepancies in the HUD-1 settlement statement and the attachment to the HUD-1 settlement statement was falsely attested, these documents did not belong to plaintiff" and thus there was "no evidence that it committed any fraud or dishonesty in handling documents that belonged to plaintiff."[98]

We conclude that the trial court and Court of Appeals majority erred by relying on *New Freedom* to interpret the CPLs in the instant case. The title insurer in *New Freedom* was liable for the actual losses arising out of the "[f]raud or dishonesty of the Issuing Agent *in* handling your funds or documents in connection with such closings,"[99] whereas in the instant case, First American is liable for actual losses arising out of "[f]raud or dishonesty of the Issuing Agent handling your funds or documents in connection with such closings." Although the distinction is slight—the only difference is the word "in"— the distinction is legally significant. As the Court of Appeals dissent properly recognized, "If the word 'in' is included, it defines, and effectively restricts, the types or

---

[97] *New Freedom*, 281 Mich App at 81 (emphasis added) (quotation marks omitted).

[98] *Id*. at 83.

[99] *Id*. at 81 (emphasis added) (quotation marks omitted).

categories of fraudulent or dishonest activities by a closing agent that can give rise to a right to indemnification, limiting them to conduct associated with handling the mortgage company's funds or documents."[100] On the other hand, "[i]f the word 'in' is not included, as is the case here, the phrase 'handling your funds or documents in connection with . . . closings' simply defines or identifies the closing agent, effectively broadening the indemnification coverage to any acts of fraud or dishonesty by the closing agent related to a closing."[101] In light of this distinction, the fraud or dishonesty by Westminster or Patriot need not be tied to their handling of Bank of America's funds or documents. As a result, Bank of America is able to offer evidence that Westminster and Patriot engaged in fraud or dishonesty in the handling of the HUD-1 settlement statements at closing, regardless of whether those documents belong to Bank of America.

Therefore, we conclude that the trial court and the Court of Appeals erred to the extent they relied on *New Freedom* to resolve this issue. Having clarified the parameters of Bank of America's claim against First American, we remand to the trial court for it to reconsider whether summary disposition in favor of First American regarding its liability under the CPLs was appropriate. On remand, the inquiry is whether genuine issues of material fact remain regarding Bank of America's actual losses arising from the fraud or dishonesty of Westminster and Patriot in connection with the closings.

---

[100] *Bank of America*, unpub op at 2 (MURPHY, C.J., concurring in part and dissenting in part).

[101] *Id.*

32

# IV. CONCLUSION

The Court of Appeals in *New Freedom* erred by extending the protections of the full credit bid rule to bar contract claims brought by the mortgagee against nonborrower third parties. Therefore, we overrule *New Freedom* to the extent it conflicts with this opinion. Further, the Court of Appeals in the instant case erred by concluding that the full credit bid rule barred recovery for Bank of America as to its claims regarding the Kirkway and Enid closings. The full credit bid rule does not bar contract claims against nonborrower third parties. For the reasons stated in this opinion, we reverse the Court of Appeals judgment and remand to the trial court for reconsideration of whether summary disposition under MCR 2.116(C)(10) was appropriate on Bank of America's contract claims against Westminster and First American. We do not retain jurisdiction.

David F. Viviano
Robert P. Young, Jr.
Stephen J. Markman
Brian K. Zahra
Bridget M. McCormack
Richard H. Bernstein
Joan L. Larsen