*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

THOMAS HOSPITALITY GROUP, INC.,

        Plaintiff-Appellee/Cross-Appellant,

v

BREE ENTERPRISES, INC.,

        Defendant-Appellant/Cross-
        Appellee,

and

BRIAN ENTERPRISES, LLC, and HARBOR
PROPERTY, LLC,

        Defendants.

UNPUBLISHED
December 3, 2019

No. 344639
Oakland Circuit Court
LC No. 2017-160381-CB

Before: CAMERON, P.J., and CAVANAGH and SHAPIRO, JJ.

PER CURIAM.

This is a breach of contract case brought by a real estate broker, plaintiff Thomas Hospitality Group, Inc., against the property owner, defendant Bree Enterprises, Inc., to recover a commission for a sale that occurred after the exclusive listing agreement expired. The trial court granted plaintiff summary disposition under MCR 2.116(C)(10) (no genuine issue of material fact), determining that plaintiff earned a commission under the terms of the agreement. However, the court ruled that plaintiff did not have a right to file a Uniform Commercial Code (UCC) financing statement and a real estate lien after the listing agreement expired. The parties appealed the respective adverse rulings. For the reasons stated in this opinion, we affirm the trial court's grant of summary disposition to plaintiff, but reverse the court's ruling that plaintiff's right to file the lien instruments expired with the listing agreement.

## I. BACKGROUND

The material facts are not in dispute. On October 14, 2014, plaintiff and defendant entered into an exclusive listing agreement for a term of one year. Plaintiff was granted the exclusive right to sell or lease defendant's bar and restaurant along with the associated personal property (collectively "the property"). There were conditions for plaintiff to receive a commission during the term of the agreement. Relevant to this appeal, the agreement also provided that plaintiff would be entitled to a commission for sale of the property that occurred after the one-year term under the following circumstances:

> [O]r if at any time after this Agreement expires, anyone sells the Property to anyone with whom or to whom anyone, during the Term of this Agreement, had negotiations for or discussions related to the sale or lease of the Property, *sent a marketing package* or other information regarding the availability of the Property, or had oral or written contact as a prospective Purchaser or Tenant of the Property, then I [i.e., defendant] will pay you [i.e., plaintiff] a commission in an amount equal to Ten (10%) Percent of the gross Sales Price . . . . [Emphasis added.]

Also relevant to this appeal, the "default" provision of the agreement granted plaintiff remedies to recover payment of an earned commission:

> As an additional inducement to you to undertake the services described herein on my behalf, I hereby grant you a security interest in all of the business assets including general intangibles and further grant you the right to file a UCC 1 lien[1] on the assets. I further grant you the right to file a lien against the Property in such amount as you deem sufficient to insure the payment of your commission as herein provided.

On October 10, 2015—four days before the listing agreement expired— Brian Yaffa sent plaintiff's president, Michael Scheid, an email stating he wanted to "look at your bar for s[ale] in [K]eego [H]arbor." On October 12, 2015, Scheid responded to the email: "Here is the information you requested. After you have had a chance to review it[] please call with questions or comments. Here it is. This is a good one. Call me." Plaintiff produced undisputed evidence that the marketing package for defendant's bar and restaurant was attached as a pdf file to the email. Scheid forwarded the email exchange with Yaffa to Joe Kakos, defendant's sole shareholder. The listing agreement expired on October 14, 2015, with no active negotiations pending.

In either late 2016 or early 2017, Yaffa and defendant entered into negotiations for sale of the property. In February 2017, Yaffa formed defendant Brian Enterprises, LLC and defendant Harbor Property, LLC (collectively "the buyers"). On behalf of those entities, he then entered

---

[1] A UCC 1 lien refers to a UCC financing statement. "UCC 1" is the name of the standard financing statement form. See MCL 440.9521(1).

into a purchase agreement with defendant for the property.[2] In March 2017, Yaffa paid defendant $150,000 toward the purchase price. Plaintiff then filed a UCC financing statement asserting a security interest against defendant's assets. Plaintiff also recorded an affidavit of interest against the real property, i.e., a real estate lien, claiming the right to a $70,000 commission.[3]

The deal closed in June 2017 for a final sales price of $770,000. Defendant financed the purchase of the property. The closing documents acknowledged the filing of the lien instruments and provided the buyers protection in the event that defendant could not obtain a discharge of the liens.

Plaintiff filed suit in August 2017 and an amended complaint in September 2017. Plaintiff alleged breach of contract with respect to the listing agreement and sought a declaratory judgment that it could proceed to foreclosure on its security interest and real property lien.

In early 2018, both parties moved for summary disposition. Plaintiff's argument was straightforward: it earned a commission under the listing agreement because it marketed the property to the eventual buyer during the one-year term of the agreement. Defendant, on the other hand, argued that plaintiff should not be able to collect a commission for "sending an email" to someone who purchased the property long after the agreement expired. Defendant maintained that plaintiff was only entitled to a commission if the property sold during the one-year term. Defendant also argued that plaintiff did not market the property to the buyers but rather to Yaffa in his individual capacity. In addition, defendant noted that it only received the deposit for the sale and that the remainder of the consideration was never paid. It is undisputed that the buyers have tendered the property back to defendant.

As for whether plaintiff was entitled to foreclose on the property, defendant argued that plaintiff did not have a right to record the lien instruments after the listing agreement expired. Plaintiff asserted that the agreement did not prohibit the filing of those instruments after the one-year term.

After hearing oral argument, the court issued its ruling from the bench. After summarizing the evidence presented by plaintiff, the trial court found that defendant failed to create a genuine issue of material fact whether: (1) plaintiff sent a marketing package to Yaffa during the agreement's one-year term; (2) Yaffa was acting on behalf of the buyers when he received the marketing package from plaintiff. The court next addressed defendant's argument that plaintiff was not entitled to a commission because the sale was never completed. The court noted that the agreement did not define the term "sells," but determined that a sale occurred when title to the property transferred at closing. Accordingly, the court determined that plaintiff was entitled to a $77,000 commission.

---

[2] Brian Enterprises purchased the personal property; Harbor Property purchased the real property.

[3] The initial purchase price for the property was $700,000.

The court then concluded that plaintiff did not have a right to file a UCC financing statement or a real estate lien after the expiration of the listing agreement. The court reasoned that those rights expired at the end of the agreement's one-year term in October 2015. The court entered orders granting in part and denying in part each party's motion for summary disposition. The court's rulings were later reduced to a final judgment entered in June 2018.

## II. ANALYSIS

## A. DEFENDANT'S APPEAL

Defendant argues that the trial court erred in granting plaintiff summary disposition. We disagree.[4]

"Ordinarily, in order for a real estate broker to recover a commission where he has an express written contract, he must show performance thereof. The court must look to the terms of the contract to determine how the commission was to be earned." *Hawkins v Smithson*, 181 Mich App 649, 652; 449 NW2d 676 (1989) (citation omitted). "The primary goal in the construction or interpretation of any contract is to honor the intent of the parties." *Rasheed v Chrysler Corp*, 445 Mich 109, 127 n 28; 517 NW2d 19 (1994). Courts "determine the parties' intent by interpreting the language of the contract according to its plain and ordinary meaning." *Bank of America, NA v First American Title Ins Co*, 499 Mich 74, 85-86; 878 NW2d 816 (2016).

In this case, the parties agreed that plaintiff would earn a commission if, "at any time after this Agreement expires," the property was sold to "anyone" to whom a "marketing package" was sent during the agreement's one-year term. Defendant now argues that merely sending an "email" should not entitle plaintiff to a commission. But our role is to apply the parties' unambiguous contract language as written. *Village of Edmore v Crystal Automation Sys Inc*, 322 Mich App 244, 263; 911 NW2d 241 (2017) ("Parties are free to contract as they see fit, and courts must enforce contracts as written unless they are in violation of law or public policy.").

Defendant repeats many of the arguments that it made before the trial court, but does not address the trial court's rulings or explain why they were erroneous. See *Derderian v Genesys*

---

[4] We review de novo a circuit court's decision to grant summary disposition. See *Pace v Edel-Harrelson*, 499 Mich 1, 5; 878 NW2d 784 (2016). "A motion made under MCR 2.116(C)(10) tests the factual sufficiency of a claim, and when the proffered evidence fails to establish a genuine issue of material fact, the moving party is entitled to judgment as a matter of law." *Hoffner v Lanctoe*, 492 Mich 450, 459; 821 NW2d 88 (2012). "A court reviewing a motion under MCR 2.116(C)(10) must consider the pleadings, affidavits, depositions, admissions, and any other evidence in favor of the party opposing the motion, and grant the benefit of any reasonable doubt to the opposing party." *White v Taylor Distrib Co, Inc*, 482 Mich 136, 139; 753 NW2d 591 (2008) (cleaned up). The interpretation of a contract is a question of law reviewed de novo. *Kloian v Domino's Pizza LLC*, 273 Mich App 449, 453; 733 NW2d 766 (2006).

*Health Care Sys*, 263 Mich App 364, 381; 689 NW2d 145 (2004) ("When an appellant fails to dispute the basis of the trial court's ruling, this Court need not even consider granting plaintiffs the relief they seek.") (cleaned up). For instance, defendant suggests that it is an open question whether plaintiff sent Yaffa a marketing package two days before the listing agreement's one-year term expired. However, as found by the trial court, defendant failed to create a genuine issue of material fact on that matter. Indeed, the email Scheid sent to Yaffa contained a pdf file titled, "Bachelor's Marketi…ge.pdf.," which is consistent with being a marketing package for defendant's bar and restaurant, Bachelor's 1 Tavern. Further, Scheid averred in an affidavit that he attached the marketing packaging for the property to the October 12, 2015 email sent to Yaffa. Defendant failed to rebut this evidence. See MCR 2.116(G)(4).

Defendant also argues that plaintiff is not entitled to a commission because the property was sold to corporate entities that were not in existence at the time that plaintiff sent the marketing package to Yaffa. As the trial court found, defendant failed to rebut the evidence that Yaffa was acting on behalf of the companies that later purchased the property. Yaffa testified at deposition that it is his usual practice to create corporate entities to purchase businesses. Moreover, he averred in an affidavit that he created Brian Enterprises and Harbor Property for the purpose of purchasing the property. Thus, when he received the marketing package from plaintiff, Yaffa was acting on behalf of the buyers.

Defendant notes that the buyers stopped making payments on the property, but does not address the trial court's ruling that a sale was completed because title transferred at closing. Further, defendant, in its role as seller, received full payment. The closing documents show that Harbor Property granted defendant a mortgage on the real property to secure a $400,000 note. Defendant was also the recipient of promissory notes totaling $220,000 to secure payment for the personal property. Thus, the full sale price was paid by the buyers. Defendant was the mortgagee as well as the seller, but the buyers' failure to repay the loan is irrelevant to whether a sale occurred.

Defendant also argues that plaintiff may not enforce the listing agreement after it expired. Again, the parties expressly agreed that plaintiff would be entitled to a commission "if at any time after this Agreement expires" the property was sold to someone whom plaintiff marketed the property to during the agreement's one-year term. These types of agreements are commonly referred to as "extension clause[s]," and are routinely enforced. See 12 CJS Brokers § 222, p 288. Their purpose "is to protect the broker by preventing the owner from postponing acceptance until the agreement has expired and thereby circumventing the broker's right to compensation for locating a purchaser." *Id*. Michigan courts have enforced extension clauses (without identifying them as such). See e.g., *Hawkins*, 181 Mich App at 650-652.

The caselaw relied on by defendant is unpersuasive. In *Craib v Comm on Nat'l Missions of Presbytery of Detroit*, 62 Mich App 617; 233 NW2d 674 (1975), the commission terms were contained in the buyer's offer; there was no listing agreement or an extension clause. There was an extension clause involved in the other case relied on by defendant, *Murphy Real Estate Corp v Barron*, 55 Mich App 210, 213; 222 NW2d 184 (1974), but the property was not sold during the listing period or the time provided by the extension clause. In contrast, the sale of the property in this case satisfied the terms of the extension clause.

In sum, the parties agreed that if plaintiff performed during the term of the listing agreement, defendant would be required to pay a commission even after the contract expired upon the happening of a condition precedent, i.e., someone to whom the property was marketed to purchased the property. Thus, when the contract expired defendant still had a conditional obligation under the contract. That the commission was not due when the agreement expired does not mean that it does not need to be paid later on. Defendant has not identified any legal authority to the contrary.

Finally, defendant argues that the commission agreement is unenforceable because it constitutes an indefinite contract term. Defendant correctly notes that, in theory, plaintiff could collect a commission "years, decades or even centuries after the expiration of the one year exclusive listing agreement," but it fails to establish that an indefinite contract term is unenforceable. Defendant's reliance on *Dumas v Auto Club Ins Ass'n*, 437 Mich 521; 473 NW2d 652 (1991) is misplaced. In that case, the Supreme Court held that the employer's oral promise of a certain commissions rate "forever" was unenforceable because it fell within the statute of fraud. *Id*. at 532-533 (quotation marks omitted). Notably, *Dumas* cuts against defendant's position because it implies that the commissions promise would have been enforceable had it been in writing, as is the case here.

Defendant also relies on *Lichnovsky v Ziebart Int'l Corp*, 414 Mich 228, 242; 324 NW2d 732 (1982), for the general rule that a contract of an indefinite duration is terminable at will. But the listing agreement itself was not for an indefinite duration. Plaintiff had only a year during which it could complete performance. Even if defendant's time of performance was indefinite, the remedy would not be to void the contract but rather to presume a reasonable time for performance. See *Opdyke Inv Co v Norris Grain Co*, 413 Mich 354, 368; 320 NW2d 836 (1982). We need not definitively decide that issue, however, because we conclude that the commission became due within a reasonable time. The listing agreement expired on October 14, 2015, and closing occurred on June 7, 2017. Less than two years was a reasonable time for performance under the circumstances of this case.

## B. PLAINTIFF'S CROSS-APPEAL

Plaintiff argues that the trial court erred in ruling that the filing of the lien instruments was untimely. We agree.

Article 9 of Michigan's UCC, MCL 440.1101 *et seq*., governs secured transactions. *Sys Soft Technologies, LLC v Artemis Technologies, Inc*, 301 Mich App 642, 652; 837 NW2d 449 (2013). Article 9 applies to "[a] transaction, regardless of its form, that creates a security interest in personal property or fixtures by contract." MCL 440.9101(1)(a). The parties do not dispute that plaintiff has an enforceable security interest in the personal property. And defendant did not appeal the trial court's order that plaintiff could proceed with foreclosure on the personal property under the UCC.

However, in order to have a *perfected* security interest, a secure party must file a financing statement. See MCL 440.9310(1) (providing that, in the absence of an exception, "a financing statement must be filed to perfect all security interests . . . ."). See also *Michigan*

*Tractor Machinery Co v Elsey*, 216 Mich App 94, 97; 549 NW2d 2 (1996). MCL 440.9509 explains when a financing statement may be filed. It provides in pertinent part:

> (1) A person may file an initial financing statement, amendment that adds collateral covered by a financing statement, or amendment that adds a debtor to a financing statement only if 1 of the following occurs:

> (a) The debtor authorizes the filing in an authenticated record or pursuant to subsection (2) or (3).

> * * *

> (2) By authenticating or becoming bound as debtor by a security agreement, a debtor or new debtor authorizes the filing of an initial financing statement, and an amendment, covering both of the following:

> (a) The collateral described in the security agreement.

"Authenticate" means "[t]o sign" or "[w]ith present intent to adopt or accept a record, to attach to or logically associate with the record an electronic sound, symbol, or process." MCL 440.9102(g)(*i*)-(*ii*). Thus, by signing the listing agreement, which in effect contained a security agreement, defendant authorized the filing of a financing statement with respect to the collateral described in that agreement. MCL 440.9509(2). In the listing agreement, defendant also expressly authorized the filing of a financing statement:

> As an additional inducement to you to undertake the services described herein on my behalf, *I hereby grant you a security interest in all of the business assets including general intangibles and further grant you the right to file a UCC 1 lien on the assets.* [Emphasis added.]

The trial court erroneously concluded that this authorization was limited to the listing agreement's one-year term. The right to file a financing statement is plainly tied to the grant of the security interest. The security interest survived the one-year term because defendant's corresponding obligation did not become due until after that point. See MCL 440.1201(ii) (" 'Security interest' means an interest in personal property or fixtures which secures payment or performance of an obligation."); *Laborers Pension Trust Fund-Detroit and Vicinity v Interior Exterior Specialists Co*, 824 F Supp 2d 764, 772 (ED Mich, 2011) ("It is true that a security interest exists only as long as the underlying debt or obligation exists."). As long as the security interest remains valid, plaintiff may file a financing statement to perfect that interest. Accordingly, we conclude that plaintiff's right to file a UCC financing statement survived the one-year term, and therefore the financing statement filed in March 2017 was timely.

For similar reasons, plaintiff's real estate lien was also timely filed. Defendant granted plaintiff the right to file a lien to ensure payment of the commission: "I further grant you the right to file a lien against the Property in such amount as you deem sufficient to insure the payment of your commission as herein provided." Yet under the trial court's reading, plaintiff's contractual remedies are restricted to the agreement's one-year term, even though defendant's obligations extend beyond that point. However, we must interpret the parties' contract "as a

whole, giving effect to all provisions." *Village of Edmore v Crystal Automation Sys Inc*, 322 Mich App 244, 251; 911 NW2d 241 (2017). Doing so in this case, there is no discernible reason why the parties would have intended to limit plaintiff's remedies to the one-year term when they also contemplated that a commission could become due thereafter. Accordingly, we conclude that plaintiff's contractual right to file a real estate lien survived the one-year term.[5]

Affirmed in part, reversed in part, and remanded. We do not retain jurisdiction.


/s/ Thomas C. Cameron
/s/ Mark J. Cavanagh
/s/ Douglas B. Shapiro

---

[5] Plaintiff does not ask us to decide whether it may foreclose on the real estate lien, so we do not address that issue.