*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

SAMIR K. JAMIL, MD and SANA JAMIL,

        Plaintiffs/Counterdefendants-
        Appellants,

v

TBI PROPERTIES, LLC, NIBRAS JAMIL, and
JOANNA THOMAS,

        Defendants/Counterplaintiffs-
        Appellees,

and

WLI PROPERTIES, LLC, CUMMINGS,
MCCLOREY, DAVIS & ACHO, PLC, BFS
RETAIL & COMMERCIAL OPERATIONS, LLC,
and OAKLAND COUNTY TREASURER,

        Defendants.

UNPUBLISHED
June 29, 2023

No. 361563
Oakland Circuit Court
LC No. 2017-157646-CH

Before: HOOD, P.J., and SHAPIRO and YATES, JJ.

PER CURIAM.

This dispute over a family business has been here before. In 2020, we vacated a verdict of no cause of action rendered at a bench trial and remanded the case "for additional findings of fact explaining the purpose of [three contractual] [a]greements and whether additional consideration was present." On remand, the trial court denied plaintiffs' request to reopen the proofs, gave more attention to the three contractual agreements, and again concluded that defendants were entitled to a verdict of no cause of action. On appeal, we affirm that verdict.

-1-

## I. BACKGROUND

Plaintiffs Samir K. Jamil, M.D., (Dr. Jamil) and Sana Jamil (Sana), a married couple, filed this case in 2017 requesting judicial foreclosure and other relief arising from a purported $510,000 loan. That loan was reflected in a December 19, 2014, promissory note identifying the borrowers as defendants TBI Properties, LLC (TBI Properties), Nibras Jamil (Nibras), and Joanna Thomas (Joanna)—both sisters-in-law of Sana. The promissory note was accompanied by an "Assignment of Membership Interest and Security Agreement" executed by the three obligors on December 23, 2014, and a "Letter Agreement" dated December 19, 2014. Those two additional documents made reference to "the sale of a building at 32600 John R., Madison Heights, Michigan . . . in the event Borrower defaults on the Note or the Security Agreement." That building owned by TBI Properties had housed a computer business called Computer Builders Warehouse (CBW) that was owned and run by the husbands of Nibras and Joanna.

The three contractual agreements were the byproduct of a convoluted business relationship that began several years earlier. Specifically, Dr. Jamil formed a company called SNJ Enterprises, Inc. (SNJ), for the purpose of operating a computer business.[1] Dr. Jamil funded SNJ using checks from his personal account, and he hired the husbands of Nibras and Joanna to work for SNJ. The husbands were embroiled in litigation arising from their prior business venture, CBW, which led to a financial obligation of nearly $3 million to a creditor, Parviz Deneshgari. Plaintiffs contended that they loaned the husbands money to get the business of SNJ called Computer Direct running, but the husbands could not repay those loans after they lost the CBW litigation to Deneshgari. The resolution of that dilemma purportedly involved the contemplated sale of SNJ to the husbands for $510,000, accomplished with three contractual agreements at the heart of this case. The building owned by TBI Properties that had housed CBW and subsequently became the home of Computer Direct was to serve as the collateral for the $510,000 loan to cover the purchase price for SNJ.

The competing parties all seem to concede that they signed the three agreements, but they disagree about the underlying facts and the meaning of the three agreements. Predictably, disputes among the parties arose that ultimately prompted plaintiffs to shut down SNJ's business, Computer Direct, in March 2015. Because Computer Direct was closed and its inventory liquidated before the due date for the $510,000 obligation on May 1, 2015, defendants claimed that they had nothing to buy by then, so they renounced their obligation to pay plaintiffs $510,000. In response, plaintiffs filed this action on March 3, 2017. In an amended complaint filed on April 25, 2017, plaintiffs set forth six claims against defendants, but the dispute eventually boiled down to plaintiffs' claims for breach of the promissory note and the security agreement.

The trial court conducted a bench trial in November of 2018. Dr. Jamil, Sana, Joanna, and Nibras testified that, in 2014, they agreed that defendants would buy SNJ Enterprises for $510,000, so plaintiffs' counsel drafted legal documents to effectuate the transaction, but the three documents did not refer to the sale of SNJ to defendants because of concerns about creditors. Following the bench trial, the trial court entered a judgment of no cause of action. Plaintiffs appealed of right in

---

[1] The minutes of the "First Meeting of the Sole Director of SNJ Enterprises, Inc." establishes that the meeting took place on March 20, 2009. At that meeting, Dr. Jamil was elected to serve as the president, secretary, and treasurer of SNJ.

*Jamil v TBI Props, LLC*, unpublished per curiam opinion of the Court of Appeals, issued December 17, 2020 (Docket No. 351024). We vacated the judgment of no cause of action because "the trial court failed to address whether the contractual agreements were of any import and supported by consideration independent of an ultimate sale of the business[.]" *Id*. at 1. We remanded the matter "for additional findings of fact explaining the purpose of the Agreements and whether additional consideration was present." *Id*. at 5.

The trial court observed that the three agreements to be considered on remand were (1) the promissory note in the amount of $510,000, (2) the security agreement that granted plaintiffs an interest in TBI Properties, and (3) the letter agreement stipulating "that neither the promissory note nor the security agreement would be recorded absent a default by [d]efendants." The trial court reaffirmed its credibility findings as part of its original opinion after the bench trial that plaintiffs "were simply not credible." The trial court further reiterated that the entire transaction, including the three agreements, involved the sale of SNJ, which was rendered impossible because plaintiffs closed the business before the contemplated transfer of ownership on May 1, 2015. The trial court explained that "[t]he business was closed months prior to the date upon which [d]efendants were to make payment for the business." Because this Court had faulted the trial court for neglecting to address the three agreements and for failing to give effect to every word in the agreements, the trial court rendered a finding that "there was not consideration for the promissory note despite the language to the contrary." The trial court also concluded that the record did not support a finding that the purported loan proceeds were provided to defendants at any time. Plaintiffs now appeal of right.

## II. LEGAL ANALYSIS

Plaintiffs have advanced procedural and substantive challenges to the trial court's decisions on remand. First, plaintiffs contend that the trial court did not follow the directive of this Court in its opinion remanding the case for further proceedings. Second, the trial court found "there was no consideration for the promissory note despite the language to the contrary" since "the record is devoid of any credible evidence to suggest the alleged loan proceeds were provided to Defendants at any time." Third, the trial court stated that "the entire transaction was one in which Plaintiffs agreed to start a business which was owned by Plaintiff Samir Jamil[,]" but Dr. Jamil "closed the business prior [to] the closing date" for the sale of the business. Fourth, the trial court concluded that the security "agreement was nothing more than window dressing to make the [$510,000] loan appear legitimate." We shall address each of these four issues in turn.

### A. COMPLIANCE WITH THE REMAND ORDER

Plaintiffs claim that the trial court did not comply with the remand order in our unpublished opinion in this case issued on December 17, 2020. If "a higher court has remanded a case, it is the duty of the lower court to comply with the remand order." *AFT v Michigan*, 334 Mich App 215, 226; 964 NW2d 113 (2020). The "lower court must strictly comply with, and may not exceed the scope of, a remand order." *Int'l Business Machines Corp v Dep't of Treasury*, 316 Mich App 346, 352; 891 NW2d 880 (2016). Whether the trial court properly followed an appellate court's ruling on remand is a question of law that this Court reviews de novo. *Pioneer State Mut Ins Co v Wright*, 331 Mich App 396, 406; 952 NW2d 586 (2020).

Our opinion remanded the case "to the trial court for additional findings of fact explaining the purpose of the [three] [a]greements and whether additional consideration was present." *Jamil*, unpub op at 5. Plaintiffs insist that our remand order obligated the trial court to reopen the proofs in order to make the additional findings of fact that we envisioned. We disagree. When a remand order contemplates reopening proofs, the order typically says so in clear terms. See, e.g., *People v Hobson*, 509 Mich 883, 884; 971 NW2d 210 (2022). Our remand order in this case said nothing of the sort. Moreover, the trial court had already conducted a comprehensive three-day bench trial in November 2018 where every important witness testified at length. In an order that was issued on December 3, 2021, the trial court offered a cogent explanation for its decision not to reopen the proofs on remand. Thereafter, the trial court issued a three-page order on May 9, 2022, that fully complied with our remand order. Specifically, the trial court made findings regarding the meaning of the three agreements and stated that "there was no consideration for the promissory note despite the language to the contrary" because "[t]he record is devoid of any credible evidence to suggest the alleged loan proceeds were provided to Defendants at any time." By rendering these findings, the trial court fully complied with our remand order.

## B. LACK OF CONSIDERATION

Plaintiffs next contend that the trial court erred in finding that "there was no consideration for the promissory note despite the language to the contrary" in that document. Whether there was "consideration for a promise is a question for the trier of fact." *Haji v Prevention Ins Agency, Inc*, 196 Mich App 84, 87-88; 492 NW2d 460 (1992). "This Court reviews a trial court's findings of fact in a bench trial for clear error and its conclusions of law de novo." *Alan Custom Homes, Inc v Krol*, 256 Mich App 505, 512; 667 NW2d 379 (2003). A finding is clearly erroneous when, after reviewing the entire record, we are "left with a definite and firm conviction that a mistake has been made." *Id.*

Consideration is an essential element of contract formation. *Bank of America, NA v First American Title Ins Co*, 499 Mich 74, 101; 878 NW2d 816 (2016). "In order for consideration to exist, there must be a bargained-for exchange—'a benefit on one side, or a detriment suffered, or service done on the other.' " *Id.* The parties' promissory note does not identify the consideration except to state that the repayment obligation of $510,000 was "FOR VALUE RECEIVED[.]" Nor does the "Assignment of Membership Interest and Security Agreement" define the consideration except to state that, "[f]or good and valuable consideration, the receipt and sufficiency of which is acknowledged, the parties agree" to the terms of that document. Under well-settled Michigan law, "[w]hile the consideration expressed in a written instrument is *prima facie* to be taken as the actual consideration, . . . parol evidence is admissible to show that the true consideration was . . . different from that expressed." *In re Rudell Estate*, 286 Mich App 391, 410; 780 NW2d 884 (2009). That principle reveals the flaws in plaintiffs' argument that consideration was provided in exchange for defendants' obligation in the promissory note to pay plaintiffs $510,000.

As an initial matter, neither the promissory note nor the security agreement identifies what consideration was provided in exchange for defendants' payment obligation of $510,000. Despite that omission, plaintiffs assert that they loaned defendants $510,000, which plainly would suffice as consideration for defendants' repayment obligation. On remand, however, the trial court made the following finding of fact: "The record is devoid of any credible evidence to suggest the alleged loan proceeds were provided to Defendants at any time." That finding is not clearly erroneous in

-4-

light of the evidence that Dr. Jamil transferred his own personal funds to his company, SNJ, rather than to defendants.[2] To be sure, SNJ apparently used some of those funds to pay rent to defendant TBI Properties, but that lease arrangement was a transaction separate from the purported loan that was reflected in the promissory note.[3] Therefore, if the promissory note is taken at face value as an obligation to repay a $510,000 loan, consideration for that bargain is entirely absent. That lack of consideration dooms plaintiffs' loan theory, so they must fall back on the theory that defendants' obligation to pay $510,000 arose from a contemplated sale of SNJ to them. That theory, however, suffers from its own fatal flaw, as we shall explain in the next subsection of this opinion.

## C. IMPOSSIBILITY OF PERFORMANCE

The trial court found that the promissory note reflected a transaction for the contemplated sale of SNJ, as opposed to a $510,000 loan.[4] Viewing the promissory note through that lens, there was sufficient consideration to support that agreement because the parties exchanged promises to buy and sell SNJ for $510,000. But as the trial court observed, the promissory note stated that the " 'Maturity Date' shall mean May 1, 2015, or such earlier date on which the outstanding principal balance hereof is due." Before that maturity date, Dr. Jamil closed down the business of SNJ, i.e., Computer Direct, thereby leaving nothing for defendants to purchase for $510,000. As defendants contended and as the trial court found, "the sale [of SNJ] was rendered impossible when Plaintiffs closed the business prior to the transfer of ownership" of SNJ. We agree.

"A promisor's [contractual] liability may be extinguished in the event his or her contractual promise becomes objectively impossible to perform." *Roberts v Farmers Ins Exch*, 275 Mich App 58, 73-74; 737 NW2d 332 (2007). Closure of a business may render performance impossible. See *Vowels v Arthur Murray Studios of Mich, Inc*, 12 Mich App 359, 363; 163 NW2d 25 (1968). The trial court found that "[t]he business was closed months prior to the date upon which Defendants were to make the payment for the business." Consequently, Dr. Jamil's unilateral decision to close the business rendered the sale of SNJ impossible, as the trial court found. Under the circumstances, to bind defendants to their obligation to pay $510,000 to plaintiffs pursuant to the promissory note would award plaintiffs the benefit of the bargain despite the fact that plaintiffs unilaterally deprived

---

[2] The record includes at least seven sizable checks written by Dr. Jamil to SNJ: (1) a $50,000 check written on January 21, 2009; (2) a $50,000 check written on January 26, 2009; (3) a $50,000 check written on January 27, 2009; (4) a $100,000 check written on March 31, 2009; (5) a $50,000 check written on April 20, 2009; (6) a $9,000 check written on December 16, 2009; (7) a $5,000 check written on November 9, 2011. The sum of those seven checks is $314,000.

[3] SNJ and defendant TBI Properties executed a "Building Lease Agreement" on February 1, 2009, which was signed by Dr. Jamil for SNJ as tenant and defendant Joanna Thomas for TBI Properties as landlord.

[4] The trial court's finding on that point is unassailable. Indeed, plaintiff's own accountant, Bruce Feinberg, testified that plaintiffs claimed, on their 2015 federal tax return, a substantial deduction for losses on the money Dr. Jamil had invested in SNJ over several years. Feinberg explained that plaintiffs could only apply that deduction if Dr. Jamil had a tax basis in SNJ to support a claim for that deduction. Thus, the hundreds of thousands of dollars that Dr. Jamil had devoted to SNJ must have been an investment in SNJ, rather than a loan to Joanna and Nibras.

defendants of their benefit of the bargain. Accordingly, the trial court properly invoked the concept of impossibility to deny plaintiffs relief on their claim for breach of the promissory note.

## D. SIGNIFICANCE OF THE SECURITY AGREEMENT AND LETTER AGREEMENT

The trial court's review of the significance of the "Assignment of Membership Interest and Security Agreement" fortifies its treatment of the promissory note and ties together the transaction involving all three agreements signed by the parties. As the trial court explained:

> The Court finds the entire transaction was one in which Plaintiffs agreed to start a business which was owned by Plaintiff Samir Jamil. The business was to be sold to Defendants on May 1, 2015, but Plaintiff Samir Jamil became infuriated with Defendants and the perceived lack of respect and closed the business prior [to] the closing date. *The purpose of the [three] Agreements was to allow the transfer of the business in order to evade the collection efforts of a prior creditor who was known to all parties. There simply was not any additional consideration beyond the agreement to sell the business to Defendants. The alleged indebtedness reflected by the Agreements was a further part of the fraud to be perpetrated upon the prior creditor.* As noted by the Court of Appeals, Defendants' liability "may be extinguished in the event [their] contractual promise becomes objectively impossible to perform." *The [entire] transaction was the formation of the business and agreement to sell the business. The purpose of the Agreements appears to have been two-fold: to perpetrate a fraud in making it appear as the transaction was simply a loan and to provide for repayment if the business becomes insolvent.* Addressing the Court of Appeals' question regarding the Security Agreement, the agreement was nothing more than window dressing to make the loan appear legitimate. (Emphasis added).

The trial court's characterization of the security agreement as "nothing more than window dressing to make the loan appear legitimate" rings true. The security agreement granted plaintiffs collateral for the purported $510,000 loan that was reflected in the promissory note. But the building owned by defendant TBI Properties was encumbered by hundreds of thousands of dollars in liens and, as a result, the building serving as collateral for the purported loan was largely valueless to plaintiffs. Nevertheless, the existence of a security agreement helped to disguise the true nature of the parties' transaction and thereby shield assets from a known creditor, i.e., Parviz Deneshgari.[5] In a similar manner, the letter agreement aided in obscuring the parties' transaction by providing that plaintiffs

---

[5] The confusion engendered by the manner in which the parties structured the alleged loan and the security agreement is reflected in our opinion on the first appeal in this case. There, we described the arrangement as follows: "defendants would execute agreements confirming plaintiffs' secured interest in the building owned by TBI as collateral for *the loans to Walter and Eugene*[,]" who are the husbands of defendants Joanna and Nibras. *Jamil*, unpub op at 2 (emphasis added). Neither plaintiffs nor defendants argue that the loans were made to the husbands. Indeed, plaintiffs chose not to name the husbands as defendants in this case. Yet the misdirection accomplished through the three agreements left even this Court confused about the nature of the parties' relationship.

as "Lender/Secured party agrees not to cause the recording of the Note or the Security Agreement in the absence of a default by Borrower[,]"[6] which was defined to include Joanna, Nibras, and TBI Properties. Because we detect no clear error in the trial court's findings of fact and we accept its characterization of the three documents as essential components of an effort to disguise the nature of the transaction, we shall affirm the trial court's verdict on remand of no cause of action.

Affirmed.

/s/ Noah P. Hood
/s/ Douglas B. Shapiro
/s/ Christopher P. Yates

---

[6] Plaintiffs did not declare a default until May 4, 2015, when they sent a letter to defendants stating that plaintiffs declared a default because defendants failed to pay the obligation on the promissory note by May 1, 2015. Although plaintiffs insist that defendants "breached the terms of the Security Agreement *before* the maturity date of the Promissory Note, thereby accelerating the debt to be due on demand," the occurrence of an event of default is not the same as a declaration of default. Indeed, section 7 of the security agreement draws this distinction by providing that, "[i]f any Event of Default occurs and continues, Secured Party may declare any and all of the Obligations to be immediately due and payable without notice[.]" The record leaves no doubt that plaintiffs first declared a default on May 4, 2015, so the claim of an existing obligation based on acceleration of the debt before May 4, 2015, is specious.